SCOTT J. RAFFERTY, ESQ. (SBN 224389)
1913 Whitecliff Court
Walnut Creek CA 94596
202-380-5525
Rafferty@gmail.com

ATTORNEY FOR PLAINTIFFS DOLORES HEURTA FOUNDATION,CELESTE
HERNANDEZ, ALEXANDER XAVIER RAMIREZ, SELENA MAYA RAMIREZ,
AND LILA PEREZ,

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DOLORES HEURTA FOUNDATION, | ) | Case No.: |
| CELESTE HERNANDEZ, | ) | |
| ALEXANDER XAVIER RAMIREZ, | ) | COMPLAINT FOR INJUNCTIVE AND |
| SELENA MAYA RAMIREZ, | ) | DECLARATORY RELIEF |
| LILA PEREZ, | ) | |
|      Plaintiffs, | ) | |
| | ) | |
|    vs. | ) | VIOLATION OF THE VOTING RIGHTS |
| | ) | ACT OF 1965, THE CALIFORNIA |
| PANAMA-BUENA VISTA UNION | ) | CONSTITUTION, AND 42 U.S.C. §1983 |
|    SCHOOL DISTRICT | ) | |
| BOARD OF EDUCATION OF PANAMA- | ) | JURY TRIAL DEMANDED |
|    BUENA VISTA UNION SCHOOL | ) | |
|    DISTRICT | ) | |
| JOHN DOE(S), | ) | |
|      Defendants | ) | |

COMES NOW Plaintiffs Dolores Huerta Foundation, Celeste Hernandez, Alexander
Xavier Ramirez, Selena Maya Ramirez and Lila Perez and allege as follows:

STATEMENT OF JURISDICTION AND VENUE

    1.    This Court has original jurisdiction over the claims stated under Section 2 of
the federal Voting Rights Act of 1965, 52 U.S.C. §10301(b), and Section 1 of the Civil Rights

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 1 -

Act of 1871, 42 U.S.C. §1983, each of which states a federal question for purposes of 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357. 52 U.S.C. §10308(f) provides that the district courts shall exercise jurisdiction without regard to whether persons asserting voting rights claims has exhausted any administrative or other remedies provided by law.

2.      28 U.S.C. §1367 confers supplemental jurisdiction over claims stated under the California constitution which have a substantial nexus to the Section 2 claims, arise from a common nucleus of facts and are so related that they form part of the same case or controversy.

3.      28 U.S.C. §§2201 and 2202 provide jurisdiction to declare plaintiffs' rights under federal law and under the California Constitution and to create a remedy.

4.      The defendant has its principal place of business in Kern County, where a substantial part of the events giving rise to this action occurs. 28 U.S.C. §1391(b)(1) and (2) and Federal Rule of Civil Procedure (F.R.C.P.) 84(b) provides for venue in the Eastern District of California. Pursuant to Local Rule 120(d), intra-district venue is proper in the Fresno Division.

PARTIES

5.      The Dolores Huerta Foundation (DHF), a California 501(c)(3) non-profit community-based grass roots organization, whose members include Latino electors who are registered to vote within the Panama-Buena Vista Union School District. Its principal place of business is in Kern County. DHF organizes at the grassroots level developing natural leaders with hands-on training through collective action in fulfillment of its mission to inspire and organize communities to build volunteer organizations empowered to pursue social justice. It has standing to assert the voting rights of its individual members and to protect its right as an organization to educate voters and to promote civic engagement.

6.      Celeste HERNANDEZ is an elector registered to vote within the territory of the Panama-Buena Vista Union School District (PBVUSD). She is a "person of Spanish heritage" (hereinafter, "Latino") and therefore a member of a

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 2 -

"protected class" for purposes of Sections 4 and 14 of the Voting Rights Act of 1965, 52 U.S.C. §§10303(f)(4) and 10310(c)(3).

7.     Alexander Xavier RAMIREZ is also a Latino elector registered to vote with the territory of PBVUSD.

8.     Serena Maya RAMIREZ is also a Latino elector registered to vote with the territory of PBVUSD.

9.     Lila PEREZ is also a Latino elector registered to vote with the territory of PBVUSD.

10.     Defendant Panama-Buena Vista Union School District (PBVUSD)  is (1) an elementary school district and part of the public school system (Cal. Const. Art. IX, §14); (2) a local education agency (Education Code, Section 35010); (3) a public entity (Gov. Code, Section 811.2); and (4) a political subdivision.[1]  PBVUSD's principal place of business is located in the City of Bakersfield; its territory includes parts of Bakersfield and unincorporated areas within Kern County.

11.     Defendant PANAMA-BUENA VISTA UNION SCHOOL DISTRICT BOARD OF EDUCATION ("BOARD") is a governing board of five trustees established pursuant to California Constitution, Art. IX, §14 and Education Code, §78.  It is a school board for purposes of the Civil Rights Act of 1964, 42 U.S.C. §2000c(d), and a person for purposes of Section 1 of the Civil Rights Act of 1875 (hereinafter, "§1983").

12.     JOHN DOES are employees, individuals or business entities, yet to be identified, that PBVUSD has employed or engaged to consult on its trustee areas, to perform demographic analyses, and to prepare materials that PBVUSD has distributed to a majority of the BOARD.  They are agents of PBVUSD and therefore persons acting under color of law for purposes of §1983.  To the extent that their activities misled the public or concealed information that the public was entitled to know, in order to maintain a method of election that violates the federal Voting Rights Act, JOHN DOES are sued and will be served in their individual capacities.

[1] within the meaning of Elections Code, Sections 10412, 14026(c), and 14051(a) and Section 14 of the Voting Rights Act, 52 U.S.C. §10310(c)(2).

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 3 -

NATURE OF THIS ACTION

13.     PBVUSD is governed by a five-member BOARD elected from two trustee areas.  The BOARD was elected at-large until 2011, when it adopted the system of electing multiple trustees from two unequally sized areas, which is challenged in this action.  The larger, more affluent trustee area has a permanent majority of three trustees, which its voters elect in the statewide general election in years when the president is elected.  A second area with a higher minority population elects two trustees in the statewide gubernatorial election, when minority turnout is lower.  The two trustee areas divide the urban area in the northeast corner of PBVUSD.

14.     EXHIBIT 1, consisting of one page attached to this complaint, shows that it is possible to create a single-member trustee area in which Latino electors constitute a majority of eligible voters.  Given the totality of the circumstances, the multi-member trustee areas have the effect of diluting the influence of Latino electors, who vote coherently and in coalition with other classes that are protected by the federal Voting Rights Act.

15.     This dilution of minority voters also violates Article I, Section 7(a) (equal protection) and Article II, Section 2.5 (right to vote) of the California Constitution.

16.     Persons acting on behalf, or under the direction, of PBVUSD presented data regarding the distribution of Latino and non-Latino voters, which these persons knew to be inaccurate.  The foreseeable consequence of these presentations was to deny the existence of a Latino majority trustee area.  These persons, acting for and with PBVUSD, deprived Plaintiffs and other citizens of rights secured by the Voting Rights Act, in violation of §1983.

17.     On February 7, 2022, Plaintiffs notified PBVUSD of its violation of Section 2 and proposed a collaborative approach to curing the violation.  On February 8 and 10, 2022, the BOARD unlawfully met in secret, denying Plaintiffs the opportunity to address the Board and public regarding its appeal to PBVUSD that it comply collaboratively.

18.     On Sunday, February 20, 2022, counsel for PBVUSD advised Plaintiffs that their "threat of litigation" excused PBVUSD from its duty to produce agenda materials for the past meetings.  (California law requires the District to disclose agenda materials and non-exempt records distributed to a majority of trustees "without delay.")  There had been

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 4 -

no threat of litigation, only an appeal to create single-member constituencies with an effective majority Latino trustee area, as required by law.

19.     This action seeks to enforce the Voting Rights Act based on the "results test" of Section 2, which does not require a showing of discriminatory intent.  After the close of business on February 18, 2022, PBVUSD gave notice that its BOARD would consider a resolution to continue its multi-member plan at a public meeting to be held the following business day.  Adopting such a resolution knowing that the plan fragments minority communities and dilutes minority voters could constitute intentional discrimination, which provides an alternative basis for Section 2 liability.  Garza v. County of Los Angeles (1990) 918 F.2d 963, 970.

FACTS

BOARD ACTIONS ON TRUSTEE AREAS

20.     Until 2012, all five trustees of PBVUSD were elected at-large.  In presidential general elections, each elector in the district could vote for three trustees; in gubernatorial elections, each elector could vote for two trustees. Candidates were eligible for election without regard to where they lived, provided their voting residence was within the PBVUSD's territory.

21.     On July 19, 2011 and August 9, 2011, the BOARD considered two options for creating trustee areas.  Before adopting the multi-trustee plan, the BOARD also discussed the "rural origins" of the District, the "rural character of its outlying areas," and the growth of the "urbanized area."  In 2010, 90% of PBVUSD's population lived 25% of its land area that the census classified as urban.

22.     The official minutes of each meeting record that the demographer stressed that "the multi-member plan is a better representation of the combination of rural and urban territories in each trustee area.  The single member plan reflects some areas as entirely urban." Item 8, July 19, 2011 PBVUSD Agenda.

23.     The plan for single trustee areas created three densely populated areas, including Area 5 in the five-area scenario, in which 52.6% of electors were either Latino, Asian-American, Native American, or Black.  Section 2 may have required creation of a

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 5 -

coalition majority district if these groups vote cohesively when compared to the rest of the electorate (*i.e.*, voters who are white and not Latino). Latinos also formed the highest share of eligible voters (38%) in Area 5, which mixed urban areas with rural areas in the southern end of PBVUSD. The demographer asserted that it was not possible to create a single-trustee area in which Latinos alone formed a majority.

24.     At the conclusion of the August 9, 2011 meeting, trustee Keith Wolaridge moved to adopt the multi-member plan, which the BOARD unanimously passed. This plan split the "urban" area in the northeast corner of PBVUSD, providing for three trustees in the West (Area 2) and two trustees in the South (Area 1), where 48% of the population is Latino.

25.     On December 14, 2011, the Kern County Committee on School District Organization approved the change to multi-trustee areas, as well as the area boundaries and election sequence.

26.     On February 14, 2012, the BOARD instructed PBVUSD's superintendent to seek a waiver of provisions in the California Education Code that requires voters to approve the change to multi-member areas at the upcoming general election. The State Board of Education granted the waiver in May 2012, so Area 2 elected three trustees in 2012, 2016, and 2020 and Area 1 elected two trustees in 2014 and 2018. No Latino trustees has ever won a contested election.

27.     Education Code, Section 5019.5 requires school districts to adjust trustee areas if necessary to maintain population equality after each decennial census. On January 18, 2022, attorney Grant Herndon advised the BOARD: "It's not possible within the district ***based on the current configuration*** to draw a majority Hispanic voting district."[2] Mr. Herndon, who is not visible to the public on the video, appears to refer to a document or presentation that was not included in the agenda packet. He acknowledges that "Hispanic citizen voting age population Trustee Area 1 is somewhere between 42 to 46 percent." *Id.* at 13:01. No witnesses appeared to testify on the redistricting. A subsequently posted presentation indicated that the BOARD would adopt a "boundary adjustment" at its regular meeting on February 8, 2022.

[2] https://www.youtube.com/watch?v=Q6duotT1cKo at 13:19.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 6 -

LATINO POPULATION AND VOTER PARTICIPATION IN PBVUSD

28.     According to the 2010 United States Census, PBVUSD had a population of 119,146.  At the time of the 2020 census, its population was 144,057, which the State of California has adjusted to 144,261 to reflect the reallocation of incarcerated persons.

29.     Since 2010, the white population of PBVUSD has declined, while Latinos and other minorities, including a Panjabi immigrant community, has steadily increased.  At the time of the 2010 census, 38.8% of PBVUSD's population was Latino, 1.3% American Indian, 8.7% Black, and 10% Asian-American (including Pacific Islander).  The 2020 census reported that 46.7% of the population is Latino, 1.6% American Indian, 8% Black, and 13.2% Asian-American.

30.     The total number of students has only increased from 16,020 to 16,280 in the past ten years, but the Latino share has increased from 47% to 59%.  White students were 30% of the student population ten years ago but are now only 19%.[3]

31.     According to American Community Survey data that the census collected between 2015 and 2019, adjusted by the California redistricting database to reallocate incarcerated persons, 30,672 out of 83,992 adult citizens (CVAP or citizen voting-age population) in PBVUSD are Latino, so the Latino share of eligible voters was 36.5%.  One percent of eligible voters are American Indian, 8.8% Black, and 10.4% Asian-American.

OFFICIAL ATTEMPTS TO MISLEAD THE PUBLIC OR TO CONCEAL INFORMATION REQUIRED TO BE DISCLOSED

32.     EXHIBIT 2, consisting of three pages attached to this Complaint, demonstrates three conflicting calculations that PBVUSD presented to its BOARD, none of which agree with these official data.  The purpose of these misrepresentations is to understate the number of Latinos eligible to vote, in an attempt to support the false claim that no Latino-majority trustee area is possible.

---

[3] https://nces.ed.gov/programs/edge/Demographic/ACS (comparison of current 2015-19 ACS with 2005-09 ACS.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 7 -

33.     Latino CVAP ranges from 30,408 to 31,640, all of which are <u>less</u> than the official tabulation.  By contrast, total CVAP ranges from 80,547 to 93,560.  The higher claim is 11.4% greater than the official count.  Given the failure to recognize the need to create a majority Latino district, the misrepresentation of these official data is highly probative of an intent to violate the federal Voting Rights Act.  Intent is sufficient, but not necessary, to establish a violation of Section 2.

34.     On February 7, 2022, counsel for Plaintiffs, notified PBVUSD that its method of election violated Section 2.  The following day, Plaintiffs produced the map of a majority-Latino district (EXHIBIT 1), which it delivered to the BOARD.  PBVUSD did not respond to these communications.

35.     State law (the "Brown Act") limits the ability of governing bodies privately to discuss exposure to liabilities that are known by the potential claimants, such as the possible violation of Section 2, which our letters disclosed.  The BOARD may not meet in closed session unless it proactively discloses the topic and allows the public to comment.  Government Code, §54954.2 and 54954.5, and 54956.9(d)(2) & (e)(2).  The Plaintiffs' communications and any other non-exempt documents distributed to the Board must be included with the agenda materials. <u>Fowler v. City of Lafayette</u> (2020) 46 Cal.App.5th 360, 370.

36.     On February 8, 2022, and again on February 10, 2022, President Wolaridge convened a special meeting of the BOARD in closed session on 24 hours' notice.  The agenda stated only that the trustees discussed a significant exposure to litigation.  In the case of a special meeting, the Brown Act creates a limited public forum at which only announced subjects can be addressed.  The BOARD declined to disclose the subject matter of the meeting in the agenda or to announce it orally, instead abruptly adjourning to the closed session without allowing public comment.  Representatives of the Plaintiffs had attended the February 8, 2022, meeting but were denied the opportunity to address the Board.  On February 19, 2022, an attorney for PBVUSD confirmed that the BOARD had discussed trustee area elections.  This failure to receive instruction from the public violated Government Code, §54954.2(a) and the First Amendment of the United States Constitution;

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 8 -

it also prevented disclosure to the public of the BOARD's violation of Section 2. *See* <u>Baca v. Moreno Valley School Board</u> (C.D. Cal. 1996) 936 F. Supp. 719.

37.    In violation of Government Code, §54959, each member of the BOARD attended these unlawful closed sessions.  Unless affirmatively misled by their attorneys, each knew or should have known that the failure to disclose the true purpose of these meetings deprived the public of information it had a right to know.  Upon information and belief, the BOARD used the two unlawfully closed sessions (1) to engage in the collective acquisition and exchange of facts preliminary to an ultimate decision and (2) to reach a collective concurrence and to devise a strategy to prevent Plaintiffs from enforcing Section 2.

38.    The Superintendent had given notice of a public hearing "to receive testimony regarding proposed maps to rebalance the BOARD's trustee areas" during a regular meeting, also scheduled for February 8, 2022.  During the meeting and without prior notice to the public, this hearing and a related item adopting one of two proposed maps were pulled from the agenda.

39.    On February 10, 2022, Plaintiffs requested that the Superintendent provide an opportunity to inspect all materials regarding trustee area elections that were distributed to a majority of the Board before or during the meetings of January 18, 2022, and February 8, 2022.  The Brown Act required the agenda packet to include these documents, which must also be available for inspection - both at the meetings and on request "without delay." Gov. Code, §54957.5(a).

40.    At 7:50PM, February 18, 2022, PVUSD posted the agenda for another closed session on the next business day, February 22, 2022.   In another violation of the Gov. Code, §54954.2(a)(1), the topic is not disclosed.  Plaintiffs' communications are not included in the agenda packet.

41.    The same evening, PVUSD posted the agenda for its regular meeting, which included item 11, "Rebalanced Trustee Area Maps and Possible Adoption of a Resolution." Again, Plaintiffs' communications to the BOARD were unlawfully omitted from the agenda

packet.  The text of the resolution will not be distributed until the meeting, so the public has no basis to prepare meaningful comment.

42.     On Sunday, February 20, 2022, counsel for PBVUSD notified Plaintiffs that PBVUSD was refusing to provide any documents pursuant to the Brown Act and would refuse inspection of any related records until March 6, 2022.  This delay again violates the Brown Act, since the BOARD has agendized the yet-to-be disclosed resolutions on February 22, 2022, without providing explanatory and relevant materials that have been distributed to a majority of the BOARD.   This aggressive action made this litigation necessary.

43.     On February 21, 2022, a state and federal holiday, Superintendent Katie Russell gave notice that PBVUSD would hold a hearing the following business day regarding "proposed maps to rebalance the Board's trustee election areas following a review of demographic information from the 2020 Census and related information."

FIRST CAUSE OF ACTION
VIOLATION OF THE VOTING RIGHTS ACT OF 1965
(RESULTS TEST)

44.     Section 2 of the Voting Rights Act prohibits practices that either intentionally discriminate against voters in a protected class or any practice shown to have a discriminatory result.  This cause of action alleges that a combination of practices dilutes Latino voting strength.  This includes (1) the election of multiple trustees by voters in two areas, (2) boundaries that submerge urban voters into areas dominated by rural voters, and (3) an election sequence that requires the less affluent area to elect in gubernatorial elections when minority vote share is at its lowest.

45.     To show a disparate impact in violation of the results test of Section 2, plaintiffs must satisfy three threshold conditions set forth in <u>Thornburg v. Gingles</u> (1986) 478 U.S. 30 and then demonstrate that totality of the circumstances indicates that the practice of multiple-trustee area elections has the effect of denying Latino and Asian-American residents an equal opportunity to participate in the political process.  <u>Gingles</u> also incorporates suggestions made by the Senate Committee on the Judiciary of the factors that

courts should consider when determining if the challenged electoral device results in a violation of Section 2.  Senate Report No. 94-217 sets forth seven primary factors and two additional probative factors that can satisfy the totality of circumstances test.  A plaintiff need not prove any particular number of these factors in order to succeed in its vote dilution claim.

46.    Regardless of whether an electoral law or practice violates Section 2's results test, Section 2 also prohibits any electoral law, practice, or procedure enacted or maintained with the intent to disadvantage voters who are members of a protected class, including maintaining a method of election that discriminates against protected-class voters or fragmenting minority groups when redrawing electoral maps.  In the context of Section 2, proof of intentional violation does not require racial animus.  The Justice Department guidance on redistricting emphasizes that federal courts draw normal inferences of intent from the foreseeability of a discriminatory impact.[4]  The Justice Department also reviews the sequence of events leading up to the decision, including departures from normal procedures, such as those described in ¶¶ 35 to 43, *supra*, for evidence of discriminatory purpose. DoJ Guidance, *op cit.* n.4, at 9-10.

THRESHOLD CONDITIONS

47.    The first condition is that the protected class of Latinos is sufficiently large and geographically compact to constitute a majority in a single-member district.

48.    EXHIBIT 1 demonstrates a potential trustee area that includes approximately one-fifth of the population of PBVUSD, is compact (four square miles bounded by major streets), in which a majority of electors (51.5%) is Latino.  The remedial trustee area may differ from this demonstration area.

49.    The second condition is that Latino electors are political cohesive as a group. Showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim.  <u>Gingles</u>, 478 U.S. at 56; <u>Gomez v. City of Watsonville</u> (1988) 863 F.2d 1407, 1415.

---

[4] "Guidance under Section 2 of the Voting Rights Act, 52 U.S.C. 10301, for redistricting and methods of electing government bodies," Department of Justice, September 2, 2021, citing <u>Garza</u>, at 10

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 11 -

50.     Political cohesiveness of the protected class is demonstrated by "racially polarized voting." This means that there is a difference in the choice of candidates or other electoral choices that are preferred by voters in a protected class, and in the choice of candidates and electoral choices that are preferred by voters in the rest of the electorate. Racially polarized voting does not incorporate any element of causation or intent.  It simply means that the race of voters correlates with the selection of certain candidates.  The Supreme Court has approved the use of bivariate ecological regression analysis to demonstrate this correlation. Thornburg v. Gingles (1986) 478 U.S. 30, 62.

51.     Since 2000, there has been only one Latino candidate for trustee in a contested election, Victor Morones in 2016.  Although two-thirds o1f the voters in his neighborhood are Latino or non-white, Trustee Area 2 is large enough to include rural areas that make its electorate 54% white and not Latino.  Area 2 elected three trustees, but Morones placed fourth, losing by less than one percent.  The fact that statistics are only available from only one or a few elections does not foreclose a voter dilution claim; even when a protected class has never been able to sponsor a candidate, courts rely on other factors that tend to prove unequal access to the electoral process. Gingles, 478 U.S. at 58 & n.25.

52.     An ecological regression of the vote for Morones by precinct estimates that 74% of Latino electors voted for him, but only 9% of the rest of the electorate.  The Latino voter count explains 83% of the variation among precincts.

53.     Area 1 did not vote for its trustees in 2016, but the entire state considered two ballot questions that posed electoral choice that affected the rights and privileges of Latinos. Proposition 51 was an initiative that authorized $9 billion in bonds for school construction and modernization.   Proposition 58 repealed an earlier initiative in order to allow bilingual education in public schools.  Regression analysis indicates that only 38% of non-Hispanic whites within the territory of PBVUSD voted in support of Proposition 51; only 49% supported restoring bilingual education.  By contrast, practically every Latino who voted favored both measures.  In these cases, the correlation with Latino ethnicity explains more than 85% of the variation.

54.     The final threshold condition is that non-Latino bloc voting usually defeats the Latino candidate of choice.  The magnitude of non-Latino bloc voting in the 2016 election is unusual in California.  If just 11% of non-Latino voters had supported Morones, he would have been elected.

SENATE FACTORS

55.     Senate Factor 1 considers the history of official voting-related discrimination in the jurisdiction and the State in which it is located.  Statewide and countywide conditions are sufficient to satisfy this factor.  <u>Gomez</u> (863 F.2d at 1419) established that this factor is satisfied on a statewide basis, citing "pervasive discrimination against Hispanics in California, including discrimination, committed by the state government, that has touched the ability of California Hispanics to participate in the electoral process."  <u>Luna v. County of Kern</u> (E.D. Cal. 2018) 219 F. Supp. 3d 1088, 1133-1135 detailed the history of official voting-related discrimination in Kern County.  Vestiges of this discrimination interact with present political structures to perpetuate the historical lack of access to the political system.

56.     In the most recent state dashboard, PBVUSD reported that suspension rates of Black, American Indian, and Latino students were high and increasing relative to other districts.  8.3% of Black students, 5.3% of American Indians, and 2.7% of Latino students had been suspended at least once.[5]

57.     Non-Latino bloc voting and the resulting chronic failure to elect its candidate of choice has demoralized the Latino community and suppressed voter participation by Latinos.  Decades of persistent inability to elect Latino candidates of choice have led to apathy and low turnout among Latinos eligible to vote, as well as drop-off in PBVUSD trustee races even among Latinos who cast ballots in the gubernatorial and presidential general elections.  Because education is a priority in Latino communities, the inability to influence the outcome of these elections reduces Latino registration and participation in other elections.

58.     Senate Factor 2 is satisfied by demonstrating that elections in the jurisdiction or State are racially polarized.  *See* ¶¶49-53, *supra*.

[5] https://www.caschooldashboard.org/reports/15633620000000/2019/conditions-and-climate#suspension-rate

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 13 -

59.     Senate Factor 3 considers practices and procedures that tend to enhance the opportunity for discrimination against the protected class.  The multiple-trustee areas were created deliberately to eliminate all-urban areas, where minority candidates could appeal to crossover voters with similar needs and values.  The boundaries fragment Latino electors, dividing high-propensity voters between the two districts in a manner that interferes with the ability of Latino electors to aggregate their votes.  The scale of mounting a successful campaign in trustee areas that are unusually large for a school district of this size makes campaign contributions and independent expenditures more effective, and grass-roots campaigning by among neighbors less effective.  The multiple-trustee area system also dilutes the effectiveness of volunteer canvassing among neighboring voters, which denies an effective role in the political process to Latinos who are not yet citizens of voting age.

60.     PBVUSD sequenced its elections so that the high Latino area (Area 1) votes for its two trustees at the general election that elects the governor and state officers, when Latino turnout declines more than the rest of the electorate.  This compounds the dilution caused by the election of multiple trustees.  The Legislature recognized the discriminatory impact on protected classes in 2016, when it amended Elections Code, §10010(b) for the purpose of giving those areas with larger numbers of minority voters priority for electing at the statewide presidential election.

61.     The large size of the three-trustee area gives an advantage to well-financed candidates.  The three Anglo candidates who won the 2016 election spent between $12,225 and $29,893 for a total of $60,701 on their campaigns.  Morones did not report expenditures because he spent less than $2,000.

62.     Senate Factor 4 asks whether Latino candidates have been denied access to candidate slating processes.  Mr. Morones was the only recent Latino candidate in a contested election.  Plaintiffs have identified no evidence of organizational endorsements.

63.     Senate Factor 5 considers the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process.  To satisfy this factor, plaintiffs must demonstrate both socio-economic discrimination and depressed political

participation but need not prove any causal nexus between the two.  Luna, 291 F. Supp. 3d at 1137-38 made extensive findings of the socio-economic disparity.  Depressed political participation is shown in low turnout among Latinos and high drop-off in elections for PBVUSD trustee.

64.     Latinos in PBVUSD bear the effects of longstanding societal, economic, and educational discrimination, results that are apparent in the areas of education, employment, housing, and health.  Such discriminatory effects hinder Latino voters' ability to participate effectively in the political process.

65.     Seventy-two percent of PBVUSD's students are socioeconomically disadvantaged and 15% are English learners.

66.     Although 37.5% of those eligible to vote in PBVUSD are Latino, the statewide database maintained by the California Legislator reports that only 28% of the voters who turned out in the 2018 general election in PBVUSD Area 1 were Latino.  As usual, there were no Latino candidates for PBVUSD trustee in 2018.  Even among those who cast ballots in other contests that year, Latino voters disproportionately "dropped off," declining to vote for PBVUSD trustee.  While white voters cast 32% of their potential vote (two trustees for each voter), Latino votes cast only 13% of their potential vote.

67.     Senate Factor 7 considers the extent to which members of the minority group have been elected to public office in the jurisdiction.  No Latino has been elected to the BOARD in a contested election since at least 2000.

68.     Additional Senate Factor 1 asks whether elected officials have been responsive to the particularized needs of minority group members.  The BOARD has not been responsive to the particularized needs of the Latino and Asian-American community, as illustrated by the misallocation of resources to the detriment of schools in high-minority areas.  The BOARD did not promptly establish bilingual education programs, even after Proposition 58 enabled PBVUSD to do so.

69.     Additional Senate Factor 2 evaluates whether the policy underlying the state or jurisdiction's use of the challenged standard, practice, or procedure is tenuous.  Consistent application of racially neutral policies does not negate a violation demonstrated

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 15 -

through other factors, but the absence of a credible, nondiscriminatory policy supports finding a violation of Section 2.  S. Rep. No. 97-417 at 29 n.117.

70.     There were two stated rationales for the rejection of single-member constituencies in 2011.  One was that two trustees lived in the same census block.  This condition no longer applies and was never a legitimate factor.  The second rationale was that the adoption of a three-trustee area (which had fewer Latinos and was more affluent) and a second two-trustee area provided "better representation of the combination of rural and urban territories in each trustee area," reflects an intent to divide communities of interest.  This increases the influence of high-propensity white, rural voters in each multi-trustee area.  It is inconsistent with traditional redistricting principles, which respect the integrity of communities of interest (such as the urban area) and do not dilute their influence by splitting them with dissimilar communities (such as the rural area).  Luna, 291 F. Supp. 3d at 1142 & n.20 rejected the same rationalization.

71.     PBVUSD does not – and cannot – provide a racially neutral justification for scheduling the three-member area with fewer Latino voters for the presidential election, even after the Legislature has condemned this practice.

72.     The totality of these circumstances, including the essential element of racially polarized voting, enables majorities within these trustee areas to elect candidates that are not the authentic candidates of choice for Latino and Asian voters and would be less likely to be elected if each area, including a majority Latino and an opportunity area for Asian-Americans, elected its own trustee, entitling plaintiffs to injunctive and declaratory relief.

SECOND CAUSE OF ACTION
VIOLATION OF THE CALIFORNIA CONSTITUTIONAL GUARANTEES OF EQUAL PROTECTION AND OF THE RIGHT TO VOTE

73.     Plaintiffs reallege paragraphs 1 through 72 as if fully set forth herein.

74.     By creating areas unequal in the number of trustees for the stated purposes of allowing former members who (in 2011) lived in the same census block to continue in office and to maintain the rural character of PBVUSD by avoiding the creation of urban trustee

areas, PBVUSD treats electors unequally in violation of Article I, Section 7(a) and Article II, Section 2 of the California Constitution.

75.     As a general matter, the California Constitution declares rights that are not dependent upon those guaranteed by the United States Constitution. Art. I, §24.  The equal protection of the law, as declared in Section 7(a), has independent vitality that may demand an analysis different from that which would obtain if only the federal standard (set forth in the 14th Amendment) were applicable. Serrano v. Priest (1976) 5 Cal.3d 584.

76.     Equality in education is a fundamental right under California law, and equal ability to influence school board policies is an essential component of that right.  Inequality among voters is subject to strict scrutiny, even if it does not have a disproportionate effect on a protected class.  Section 7(a) significantly curtails discrimination on any geographic basis, based on the fundamental right to equality in education that all residents have, without regard to race.

77.     In the context of school board elections, the California Supreme Court has held that "a voter's address may not determine the weight to which his ballot is entitled." Serrano, 5 Cal.3d at 614.

78.     In the case of access to education, Section 7(a) also prohibits disproportionate impacts on minorities even in the absence of purposeful discrimination.  Even after the United States Supreme Court held that the Fourteenth Amendment did not implicitly or explicitly protect educational equality as a fundamental right, California courts continued to apply strict scrutiny and to impose a constitutional duty to avoid "unequal effects" even in the absence of intent or purpose to discriminate.  The Supreme Court confirmed that the Section 7(a) expands the protections conferred by the Equal Protection clause in the federal constitution, and that it validly bars de facto discrimination and requires reasonable steps to alleviate it.

79.     California state courts have also recognized the democratic accountability that single-trustee areas provide is an essential remedy to guarantee equal consideration of minority neighborhoods in the governance of school districts.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 17 -

80.     The California Constitution, Art. II, §2, guarantees an affirmative right to vote, in contrast to federal constitution protections, which (except for application of the Equal Protection Clause) merely prohibit discrimination based on race, gender, or age.  Vote dilution based on place of residence impairs this fundamental right, subjecting any classification that dilutes the vote to strict scrutiny even if it is not based on "invidious discriminations based upon factors such as race."  As a result, California courts have repeatedly held that school boards cannot dilute the weight of any elector's vote based on geography.[6]

81.     Pursuant to 28 U.S.C. §2201 and 2202, this Court has jurisdiction to enforce the California jurisdiction by granting declaratory and injunctive relief, including the approval of a map of single trustee areas and a schedule of elections.

## THIRD CAUSE OF ACTION
## 42 U.S.C. §1983

82.     Plaintiffs reallege paragraphs 1 through 81 as if fully set forth herein.

83.     PBVUSD is a "person" for purposes of 42 U.S.C. §1983.  When the BOARD adopted its preferred map on August 9, 2011, it promulgated the method for electing trustees as an official policy of PBVUSD.

84.      The electoral method is the proximate cause of voter dilution, which denies Plaintiffs HERNANDEZ, RAMIREZ, RAMIREZ, and PEREZ (and other members of DHF who are Latino electors of PBVUSD) of the rights and privileges established by Section 2 of the Voting Rights Act.  The policy also interferes with DHF's ability to fulfill its organizational mission and role of organizing voters and community leaders.  Having adopted the dilutive method as a formal policy, PBVUSD is directly responsible for the continuing violation of Plaintiffs' federal statutory rights, as are officials, employees and agents who take non-ministerial, discretionary actions to perpetuate the violation.

85.     In January and February 2022, PBVUSD, acting as directed by or in concert with JOHN DOES, has taken and continues to take a series of concerted actions to conceal the ongoing violation of the Section 2 from its constituents and from persons authorized to

---

[6] Tinsley v. Palo Alto USD (1979) 91 Cal.App.3rd 871, 904; Butt v. State of California (1992) 4 Cal.4th 668, 682.

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 18 -

enforce the Voting Rights Act. *See* ¶¶ 32-43, *supra*. The purpose of the continuing course of action was, and is, to perpetuate the electoral method that violates Plaintiffs' rights under a federal statute, 52 U.S.C. §10301(b).

86.     Upon information and belief, JOHN DOES falsely advised trustees that an appeal to comply with federal law constituted a "threat of litigation" and entitled them to meet secretly to devise a strategy to evade compliance. Upon information and belief, JOHN DOES further advised the BOARD to deprive Plaintiffs of their right to a forum to disclose the violation and appeal for its correction. This violated their right to petition the Board and interfered with their ability to access the federal courts if and only if that became necessary.

87.     JOHN DOES, even if they include trustees, cannot claim legislative immunity because the strategic decisions taken on February 8 and 10, 2022 were not legislative in nature and because the BOARD lacks authority to act at closed sessions that violate Gov. Code, §54959.

88.     JOHN DOES, even if they include employees of PBVUSD, lack any claim to qualified immunity because the federal rights they violated are clearly established, including (1) the right to cast an undiluted vote and (2) the right to address the school board during a limited public forum.

89.     All Plaintiffs seek prospective injunctive and declaratory relief eliminating the multi-member districts and creating a Latino majority trustee area.

90.     If this matter concludes quickly, nominal damages may be sufficient to restore the ability of DHF to fulfill its organizational mission of incorporating immigrant, minority, and working-class neighborhoods into local political life.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against PVBUSD as follows:

1.     For a decree declaring that the current method by which two areas elect multiple trustees, with a majority being elected by the more affluent area with a smaller proportion of minority elects in the presidential cycle, violates Section 2 of the Voting Rights

Act of 1965, 52 U.S.C. §10301(b), as well as Article I, Section 7(a) and Article II, Section 2 of the California Constitution and Section 1 of the Civil Rights Act of 1871, 42 U.S.C. §1983.

2. For preliminary and permanent injunctive relief prohibiting PBVUSD, its superintendent, its trustees and other officials acting under their direction or in concert with them, from calling, conducting or certifying the results of any election that does not elect by single-trustee areas.

3. For a declaratory judgment enjoining PBVUSD to comply with the relevant provisions of the Voting Rights Act and California Constitution and directing an appropriate remedy, including (1) a remedial map with a majority Latino trustee area, (2) election sequence that reflects the extent to which this area has enjoyed higher participation by minority electors in the statewide general election that votes for President, and (3) the establishment of an independent commission to redistrict the trustee areas after the 2030 decennial census.

4. For nominal or other damages to reflect the burdens and obstacles that at-large and non-district-based elects place on the organizational mission of DHF to improve civil engagement among immigrant, minority, and working-class communities.

5. For continuing jurisdiction of this Court pursuant to 52 U.S.C. §10302.

6. For an award of Plaintiffs' attorneys' and expert witnesses' fees, costs, litigation expenses, and prejudgment interest pursuant to 42 U.S.C. §1988, 52 U.S.C. §10310(e), Code of Civil Procedure, Section 1021.5 and other applicable law.

7. For trial by jury.

8. For such further relief as the Court may deem proper.

Dated this 22nd day of February 2022     Respectfully submitted,

*Scott Rafferty*

Scott J. Rafferty

ATTACHMENTS:
EXHIBIT 1. MAP AND DEMOGRAPHIC DATA FOR SINGLE TRUSTEE AREA
    DEMONSTRATING LATINO MAJORITY (1 page)
EXHIBIT 2. PBVUSD CLAIMS REGARDING NUMBER OF ELIGIBLE VOTERS AND
    COMPARISON TO OFFICIAL DATA (3 pages)

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF- 20 -

EXHIBIT 1

LATINO MAJORITY DEMONSTRATION TRUSTEE AREA



| | | Latino majority area | 1 South (2 trustees) | | 2 West (3 trustees) | | PBVUSD total | |
|---|---|---|---|---|---|---|---|---|
| | | | 2020 | 2010* | 2020 | 2010* | 2020 | 2010 |
| Population | Black | 1,810 | 4,737 | 4,440 | 6,285 | 5,640 | 11,022 | 10,080 |
| | Asian | 5,452 | 8,658 | 5,997 | 10,436 | 7,231 | 19,094 | 11,228 |
| | Latino | 15,819 | 34,747 | 22,923 | 32,668 | 23,315 | 67,415 | 46,238 |
| | Total | 28,036 | 61,614 | 47,659 | 82,647 | 71,487 | 144,261 | 119,146 |
| | Black% | 6.5% | 7.7% | 9.3% | 7.6% | 7.9% | 7.6% | 8.5% |
| | Asian% | 19.4% | 14.1% | 8.4% | 12.6% | 10.1% | 13.2% | 9.4% |
| | Latino% | 56.4% | 56.4% | 48.1% | 39.5% | 32.6% | 46.7% | 38.8% |
| | | | | | | | | |
| CVAP | Black | 1,061 | 4,517 | 2,021 | 2,816 | 3,059 | 7,333 | 5,080 |
| | Asian | 1,980 | 3,427 | 1,234 | 5,437 | 2,606 | 8,864 | 3,840 |
| | Latino | 7,246 | 15,478 | 8,566 | 15,194 | 9,306 | 30,672 | 17,872 |
| | Total | 14,015 | 33,317 | 24,900 | 50,675 | 43,301 | 83,992 | 68,201 |
| | Black% | 7.6% | 13.6% | 8.1% | 5.6% | 7.1% | 8.7% | 7.4% |
| | Asian% | 14.1% | 10.3% | 5.0% | 10.7% | 6.0% | 10.6% | 5.6% |
| | Latino% | 51.7% | 46.5% | 34.4% | 30.0% | 21.5% | 36.5% | 26.2% |

* unverified - per July 19, 2011 NDC presentation

# EXHIBIT 2

## Panama-Buena Vista School District - Test #1
### Assessment Based on 2021 Final Statewide Database Prisoner-Adjusted Data & NDC CVAP Estimates

| Trustees | 1 | % | 2 | % | Totals (5) | % |
|---|---|---|---|---|---|---|
| Total Pop. (SWDB 2021) | 58,561 | | 85,938 | | 144,499 | |
| Hispanic Pop. | 33,236 | 56.75% | 34,283 | 39.89% | 67,519 | 46.73% |
| NH Black Pop. (DOJ) | 10,849 | 18.53% | 31,692 | 36.88% | 42,541 | 29.44% |
| NH White Pop. (DOJ) | 4,444 | 7.59% | 6,635 | 7.72% | 11,079 | 7.67% |
| NH Indian Pop. (DOJ) | 644 | 1.10% | 1,249 | 1.45% | 1,893 | 1.31% |
| NH Asian Pop. (DOJ) | 8,361 | 14.28% | 10,457 | 12.17% | 18,818 | 13.02% |
| NH Hawaiian/Pacific Islander Pop. (DOJ) | 126 | 0.22% | 167 | 0.19% | 293 | 0.20% |
| NH Other Pop. (DOJ) | 563 | 0.96% | 905 | 1.05% | 1,468 | 1.02% |
| NH Other MR Pop. (DOJ) | 338 | 0.58% | 550 | 0.64% | 888 | 0.61% |
| VAP Age Pop. (18+) (SWDB 2021) | 41,427 | | 64,211 | | 105,638 | |
| Hispanic VAP | 21,945 | 52.97% | 23,248 | 36.21% | 45,193 | 42.78% |
| NH Black VAP | 8,763 | 21.15% | 26,201 | 40.80% | 34,964 | 33.10% |
| NH White VAP | 3,056 | 7.38% | 4,741 | 7.38% | 7,797 | 7.38% |
| NH Indian VAP (DOJ) | 502 | 1.21% | 971 | 1.51% | 1,473 | 1.39% |
| NH Asian VAP (DOJ) | 6,483 | 15.65% | 7,960 | 12.40% | 14,443 | 13.67% |
| NH Hawaiian/Pacific Islander VAP (DOJ) | 77 | 0.19% | 133 | 0.21% | 210 | 0.20% |
| NH Other VAP (DOJ) | 393 | 0.95% | 612 | 0.95% | 1,005 | 0.95% |
| NH Other MR VAP (DOJ) | 208 | 0.50% | 345 | 0.54% | 553 | 0.52% |
| CVAP (SWDB 2021) | 31,999 | | 48,638 | | 80,547 | |
| Hispanic CVAP | 14,415 | 45.18% | 15,993 | 32.88% | 30,408 | 37.75% |
| NH White CVAP | 2,484 | 7.78% | 4,438 | 9.12% | 6,922 | 8.59% |
| NH Black CVAP | 10,651 | 33.28% | 23,152 | 47.60% | 33,803 | 41.59% |
| NH Amer. Ind. CVAP | 305 | 0.96% | 521 | 1.07% | 826 | 1.03% |
| NH Asian CVAP | 3,373 | 10.54% | 4,389 | 9.02% | 8,121 | 10.08% |
| NH Hawaiian CVAP | 80 | 0.25% | 35 | 0.07% | 115 | 0.14% |
| NH Other CVAP | 31 | 0.10% | 182 | 0.35% | 214 | 0.25% |
| CVAP (NDC ST 2015-2019 m2) | 35,482 | | 58,079 | | 93,560 | |
| Hispanic CVAP | 15,053 | 42.43% | 16,587 | 28.56% | 31,640 | 33.82% |
| NH White CVAP | 10,416 | 29.35% | 24,936 | 42.93% | 35,351 | 37.78% |
| NH Black CVAP | 2,631 | 7.42% | 4,728 | 8.14% | 7,359 | 7.87% |
| NH Asian CVAP | 3,373 | | 5,588 | 10.64% | 8,961 | 10.67% |
| NH Hawaiian CVAP | 342 | 1.09% | 505 | 0.96% | 847 | 1.01% |
| NH Other & MR CVAP | 80 | 0.25% | 35 | 0.07% | 115 | 0.14% |
| CVAP (NDC ACS 2015-2019 m2) | 35,482 | | 58,079 | | 93,560 | |
| Hispanic CVAP | 15,053 | 42.43% | 16,587 | 28.56% | 31,640 | 33.82% |
| NH White CVAP | 10,416 | 29.35% | 24,936 | 42.93% | 35,351 | 37.78% |
| NH Asian CVAP | 2,631 | 7.42% | 4,728 | 8.14% | 7,359 | 7.87% |
| NH Hawaiian CVAP | 179 | 0.50% | 327 | 0.56% | 506 | 0.54% |
| NH Other CVAP | 3,209 | 9.04% | 4,996 | 8.60% | 8,205 | 8.77% |
| NH Other MR CVAP | 81 | 0.23% | 57 | 0.10% | 138 | 0.15% |
| | 3,034 | 8.55% | 5,071 | 8.73% | 2,255 | 2.41% |
| | 879 | 2.48% | 1,376 | 2.37% | 2,255 | 2.41% |

| Trustees | 1 | % | 2 | % | Totals (5) | % |
|---|---|---|---|---|---|---|
| Registered Voters (Nov 2018 - SWDB) | 22,734 | | 41,864 | | 64,598 | |
| SS Registered Voters (Nov 2018 - SWDB) | 9,861 | 43.38% | 11,200 | 26.75% | 21,061 | 32.60% |
| White Registered Voters (Nov 2018 - SWDB) | 1,635 | 7.19% | 1,958 | 4.68% | 3,594 | 5.56% |
| Filipino Registered Voters (Nov 2018 - SWDB) | 297 | 1.31% | 596 | 1.42% | 893 | 1.38% |
| AS Registered Voters (Nov 2018 - SWDB) | 8,353 | 36.74% | 23,940 | 57.19% | 32,293 | 49.99% |
| Black Registered Voters (Nov 2018 - SWDB) | 1,750 | 7.70% | 2,976 | 7.11% | 4,726 | 7.32% |
| Actual Voters (Nov 2018 - Est.) | 10,568 | | 24,591 | | 35,159 | |
| SS Actual Voters (Nov 2018 - Est.) | 4,071 | 38.52% | 5,388 | 21.91% | 9,459 | 26.90% |
| White Actual Voters (Nov 2018 - Est.) | 615 | 5.82% | 937 | 3.81% | 1,552 | 4.41% |
| Filipino Actual Voters (Nov 2018 - Est.) | 138 | 1.31% | 305 | 1.24% | 443 | 1.26% |
| AS Actual Voters (Nov 2018 - Est.) | 4,486 | 42.45% | 15,553 | 63.25% | 20,039 | 57.00% |
| Black Actual Voters (Nov 2018 - Est.) | 925 | 8.75% | 2,696 | 7.20% | 3,621 | 7.67% |
| Registered Voters (Mar 2020 - SWDB) | 24,570 | | 44,511 | | 69,082 | |
| SS Registered Voters (Mar 2020 - SWDB) | 11,076 | 45.08% | 12,619 | 28.35% | 23,695 | 34.30% |
| White Registered Voters (Mar 2020 - SWDB) | 1,906 | 7.76% | 2,231 | 5.01% | 4,137 | 5.99% |
| Filipino Registered Voters (Mar 2020 - SWDB) | 334 | 1.36% | 688 | 1.55% | 1,022 | 1.48% |
| AS Registered Voters (Mar 2020 - SWDB) | 7,908 | | 19,618 | | 27,526 | 25.08% |
| Black Registered Voters (Mar 2020 - SWDB) | 478 | 6.05% | 4,041 | 20.60% | 6,903 | |
| Actual Voters (Mar 2020 - SWDB) | 112 | 1.41% | 240 | 3.25% | 352 | 1.28% |
| Registered Voters (Nov 2020 - SWDB) | 26,725 | | 47,725 | | 74,450 | |
| SS Registered Voters (Nov 2020 - SWDB) | 12,172 | 45.54% | 13,941 | 29.21% | 26,113 | 35.07% |
| White Registered Voters (Nov 2020 - SWDB) | 2,160 | 8.08% | 2,529 | 5.30% | 4,689 | 6.30% |
| Filipino Registered Voters (Nov 2020 - SWDB) | 400 | 1.50% | 688 | 1.55% | 1,168 | 1.57% |
| AS Registered Voters (Nov 2020 - SWDB) | 8,233 | 30.80% | 23,929 | 50.14% | 32,162 | 43.20% |
| Black Registered Voters (Nov 2020 - SWDB) | 2,325 | 8.70% | 4,046 | 8.48% | 6,371 | 8.56% |
| Actual Voters (Nov 2020 - SWDB) | 18,434 | | 56,271 | | | |
| SS Actual Voters (Nov 2020 - SWDB) | 8,033 | 43.58% | 9,921 | 26.93% | 17,954 | 32.48% |
| White Actual Voters (Nov 2020 - SWDB) | 1,553 | 8.42% | 1,935 | 5.25% | 3,488 | 6.31% |
| Filipino Actual Voters (Nov 2020 - SWDB) | 272 | 1.47% | 568 | 1.54% | 840 | 1.52% |
| AS Actual Voters (Nov 2020 - SWDB) | 5,959 | 32.32% | 19,377 | 52.60% | 25,336 | 45.84% |
| Black Actual Voters (Nov 2020 - SWDB) | 1,644 | 8.92% | 3,091 | 8.39% | 4,735 | 8.57% |
| Total Min CVAP (SWDB 2021) | 21,258 | 66.62% | 25,486 | 52.40% | 46,744 | 58.04% |
| Total Min CVAP (NDC ST 2015-2019 m2) | 21,100 | 67.13% | 27,019 | 51.44% | 48,119 | 57.32% |
| Total Min CVAP (NDC ACS 2015-2019 m2) | 25,066 | 70.65% | 33,143 | 57.07% | 58,209 | 62.22% |

| | 1 | 2 | Total Deviation |
|---|---|---|---|
| Ideal (Per Trustee): | 28,900 | | |
| Deviation Range | 1,523 | | |
| Total Deviation % | **2.20%** | | |

### Deviation

| | 1 | 2 |
|---|---|---|
| Pop. | 58,561 | 85,938 |
| Ideal | 57,800 | 86,699 |
| Dev. | 761 | -761 |
| Dev. % | 1.32% | -0.88% |

NH = Not of Hispanic Origin
MR = Multiracial
CVAP = Citizen Voting Age Population
ACS = American Community Survey
DOJ = USDOJ/OMB's Aggregation

ST = USDOJ's Special Tabulation
SWDB = Statewide Database
NDC = National Demographics Corporation
SS = Spanish-Surname Matched
AS = Asian-Surname Matched

# Panama-Buena Vista School District - Test #2
## Assessment Based on 2021 Final Statewide Database Prisoner-Adjusted Data & NDC CVAP Estimates

Cas...

### Abbreviations

| Code | Meaning |
|---|---|
| NH | Not of Hispanic Origin |
| MR | Multiracial |
| CVAP | Citizen Voting Age Population |
| ACS | American Community Survey |
| DOJ | USDOJ/OMB's Aggregation |
| ST | USDOJ's Special Tabulation |
| SWDB | Statewide Database |
| NDC | National Demographics Corporation |
| SS | Spanish-Surname Matched |
| AS | Asian-Surname Matched |

### Population / VAP / CVAP

| Trustees | 1 | % | 2 | % | Totals | % |
|---|---|---|---|---|---|---|
| Total Pop. (SWDB 2021) | 59,967 | | 84,532 | | 144,499 | |
| Hispanic Pop. | 33,661 | 56.13% | 33,858 | 40.05% | 67,519 | 46.73% |
| NH Black Pop. (DOJ) | 4,450 | 7.42% | 6,629 | 7.84% | 11,079 | 7.67% |
| NH White Pop. | 11,657 | 19.44% | 30,884 | 36.54% | 42,541 | 29.44% |
| NH Asian Pop. (DOJ) | 8,464 | 14.11% | 10,354 | 12.25% | 18,818 | 13.02% |
| NH Amer. Ind. Pop. (DOJ) | 664 | 1.11% | 1,229 | 1.45% | 1,893 | 1.31% |
| NH Hawaiian/Pacific Islander Pop. (DOJ) | 133 | 0.22% | 160 | 0.19% | 293 | 0.20% |
| NH Other Pop. (DOJ) | 586 | 0.98% | 882 | 1.04% | 1,468 | 1.02% |
| NH Other MR Pop. (DOJ) | 352 | 0.59% | 536 | 0.63% | 888 | 0.61% |
| VAP Age Pop. (18+) (SWDB 2021) | 43,572 | | 63,066 | | 105,638 | |
| Hispanic VAP | 22,251 | 52.27% | 22,942 | 36.38% | 45,193 | 42.78% |
| NH Black VAP | 3,082 | 7.24% | 4,715 | 7.48% | 7,797 | 7.38% |
| NH White VAP | 9,440 | 22.17% | 25,624 | 40.47% | 34,984 | 33.10% |
| NH Asian VAP (DOJ) | 6,567 | 15.43% | 7,876 | 12.49% | 14,443 | 13.67% |
| NH Amer. Ind. VAP (DOJ) | 516 | 1.21% | 957 | 1.52% | 1,473 | 1.39% |
| NH Hawaiian/Pacific Islander VAP (DOJ) | 83 | 0.19% | 127 | 0.20% | 210 | 0.20% |
| NH Other VAP (DOJ) | 417 | 0.98% | 588 | 0.93% | 1,005 | 0.95% |
| NH Other MR VAP (DOJ) | 216 | 0.51% | 337 | 0.53% | 553 | 0.52% |
| CVAP (SWDB 2021) | 33,953 | | 46,594 | | 80,547 | |
| Hispanic CVAP | 15,220 | 44.83% | 15,188 | 32.60% | 30,408 | 37.75% |
| NH White CVAP | 11,597 | 34.16% | 22,206 | 47.66% | 33,803 | 41.97% |
| NH Black CVAP | 2,639 | 8.06% | 4,719 | 9.22% | 7,358 | 8.76% |
| NH Asian CVAP | 3,395 | 10.37% | 5,566 | 10.87% | 8,961 | 10.67% |
| NH Amer. Ind. CVAP | 419 | 1.28% | 428 | 0.84% | 847 | 1.01% |
| NH Hawaiian CVAP | 382 | 1.13% | 444 | 0.95% | 826 | 1.03% |
| NH Other CVAP | 80 | 0.24% | 35 | 0.07% | 115 | 0.14% |
| NH Other MR CVAP | 31 | 0.10% | 182 | 0.36% | 214 | 0.25% |
| CVAP (NDC ST 2015-2019 m2) | 32,754 | | 51,200 | | 83,954 | |
| Hispanic CVAP | 15,407 | 47.04% | 15,407 | 30.09% | 30,025 | 36.48% |
| CVAP (NDC ACS 2015-2019 m2) | 36,952 | | 56,608 | | 93,560 | |
| Hispanic CVAP | 15,470 | 41.87% | 16,170 | 28.56% | 31,640 | 33.82% |
| NH White CVAP | 11,005 | 29.78% | 24,347 | 43.01% | 35,351 | 37.78% |
| NH Black CVAP | 2,627 | 7.11% | 4,732 | 8.36% | 7,359 | 7.87% |
| NH Asian CVAP | 3,265 | 8.84% | 4,940 | 8.73% | 8,205 | 8.77% |
| NH Hawaiian CVAP | 180 | 0.49% | 326 | 0.58% | 506 | 0.54% |
| NH Other CVAP | 81 | 0.22% | 57 | 0.10% | 138 | 0.15% |
| NH Other MR CVAP | 3,339 | 9.04% | 4,766 | 8.42% | 8,105 | 8.66% |
| Other MR CVAP | 984 | 2.66% | 1,270 | 2.24% | 2,255 | 2.41% |

### Registered / Actual Voters & Minority CVAP

| Trustees | 1 | % | 2 | % | Totals | % |
|---|---|---|---|---|---|---|
| Registered Voters (Nov 2018 - SWDB) | 23,530 | | 41,067 | | 64,598 | |
| SS Registered Voters (Nov 2018 - SWDB) | 9,993 | 42.47% | 11,068 | 26.95% | 21,061 | 32.60% |
| AS Registered Voters (Nov 2018 - SWDB) | 1,641 | 6.98% | 1,952 | 4.75% | 3,594 | 5.56% |
| Filipino Registered Voters (Nov 2018 - SWDB) | 297 | 1.26% | 596 | 1.45% | 893 | 1.38% |
| White Registered Voters (Nov 2018 - SWDB) | 8,915 | 37.89% | 23,378 | 56.93% | 32,293 | 49.99% |
| Black Registered Voters (Nov 2018 - SWDB) | 1,831 | 7.78% | 2,896 | 7.05% | 4,726 | 7.32% |
| Actual Voters (Nov 2018 - SWDB) | 11,011 | | 24,148 | | 35,159 | |
| SS Actual Voters (Nov 2018 - SWDB) | 4,118 | 37.40% | 5,341 | 22.12% | 9,459 | 26.90% |
| AS Actual Voters (Nov 2018 - SWDB) | 618 | 5.61% | 934 | 3.87% | 1,552 | 4.41% |
| Filipino Actual Voters (Nov 2018 - Est.) | 136 | 1.24% | 307 | 1.27% | 443 | 1.26% |
| White Actual Voters (Nov 2018 - SWDB) | 4,823 | 43.80% | 15,216 | 63.01% | 20,039 | 57.00% |
| Black Actual Voters (Nov 2018 - Est.) | 975 | 8.86% | 1,721 | 7.12% | 2,696 | 7.67% |
| Registered Voters (Mar 2020 - SWDB) | 25,414 | | 43,667 | | 69,082 | |
| SS Registered Voters (Mar 2020 - SWDB) | 11,238 | 44.22% | 12,457 | 28.53% | 23,695 | 34.30% |
| AS Registered Voters (Mar 2020 - SWDB) | 1,914 | 7.53% | 2,223 | 5.09% | 4,137 | 5.99% |
| Filipino Registered Voters (Mar 2020 - SWDB) | 340 | 1.34% | 682 | 1.56% | 1,022 | 1.48% |
| White Registered Voters (Mar 2020 - SWDB) | 8,296 | 32.64% | 27,526 | 63.04% | 19,230 | 20.76% |
| Black Registered Voters (Mar 2020 - SWDB) | 2,911 | 35.09% | 3,892 | 3.84% | 6,803 | 25.08% |
| Actual Voters (Mar 2020 - SWDB) | | | | | | |
| SS Actual Voters (Mar 2020 - SWDB) | 476 | 5.74% | 738 | | 1,214 | 1.20% |
| Filipino Actual Voters (Mar 2020 - SWDB) | 122 | 1.47% | 230 | | 352 | 1.28% |
| Registered Voters (Nov 2020 - SWDB) | 27,598 | | 46,852 | | 74,450 | |
| SS Registered Voters (Nov 2020 - SWDB) | 12,346 | 44.73% | 13,767 | 29.38% | 26,113 | 35.07% |
| AS Registered Voters (Nov 2020 - SWDB) | 2,175 | 7.88% | 2,514 | 5.37% | 4,689 | 6.30% |
| Filipino Registered Voters (Nov 2020 - SWDB) | 410 | 1.48% | 682 | 1.62% | 1,168 | 1.57% |
| White Registered Voters (Nov 2020 - SWDB) | 8,847 | 32.06% | 23,314 | 49.76% | 32,162 | 43.20% |
| Black Registered Voters (Nov 2020 - SWDB) | 2,367 | 8.58% | 4,004 | 8.55% | 6,371 | 8.56% |
| Actual Voters (Nov 2020 - SWDB) | 19,131 | | 36,141 | | 55,271 | |
| SS Actual Voters (Nov 2020 - SWDB) | 8,160 | 42.65% | 9,794 | 27.10% | 17,964 | 32.48% |
| AS Actual Voters (Nov 2020 - SWDB) | 1,562 | 8.16% | 1,926 | 5.33% | 3,488 | 6.31% |
| Filipino Actual Voters (Nov 2020 - SWDB) | 275 | 1.44% | 565 | 1.56% | 840 | 1.52% |
| White Actual Voters (Nov 2020 - Est.) | 6,454 | 33.74% | 18,882 | 52.25% | 25,336 | 45.84% |
| Black Actual Voters (Nov 2020 - SWDB) | 1,694 | 8.86% | 3,041 | 8.41% | 4,735 | 8.57% |
| Total Min CVAP (SWDB 2021) | 22,356 | 65.84% | 24,388 | 52.34% | 46,744 | 58.03% |
| Total Min CVAP (NDC ST 2015-2019 m2) | 21,782 | 66.50% | 26,337 | 51.44% | 48,119 | 57.32% |
| Total Min CVAP (NDC ACS 2015-2019 m2) | 25,947 | 70.22% | 32,262 | 56.99% | 58,209 | 62.22% |

Ideal (Per Trustee): 28,900

Deviation Range: 4,335

Total Deviation %: **6.25%**

### Deviation

| | 1 | 2 |
|---|---|---|
| Pop. | 59,967 | 84,532 |
| Ideal | 57,800 | 86,699 |
| Dev. | 2,167 | -2,167 |
| Dev. % | 3.75% | -2.50% |

# DISPARITIES BETWEEN EXHIBIT 2 AND OFFICIAL DATA

| | Area 1 two trustees | | Area 2 three trustees | | TOTAL | |
|---|---|---|---|---|---|---|
| **ACTUAL CALIFORNIA REDISTRICTING DATABASE** | | | | | | |
| CVAP | 33,317 | | 50,675 | | 83,992 | |
| Latino CVAP | 15,478 | 46.5% | 15,194 | 30.0% | 30,672 | 36.5% |
| | | | | | | |
| **CLAIMS FROM EXHIBIT 2** | | | | | | |
| CVAP (SWDB 2021) | 33,953 | | 46,594 | | 80,547 | |
| Hispanic CVAP | 15,220 | 44.83% | 15,188 | 32.60% | 30,408 | 37.75% |
| CVAP (NDC ST 2015-2019 m2) | 32,754 | | 51,200 | | 83,954 | |
| Hispanic CVAP | 15,217 | 46.46% | 15,407 | 30.09% | 30,625 | 36.48% |
| CVAP (NDC ACS 2015-2019 m2) | 36,952 | | 56,608 | | 93,560 | |
| Hispanic CVAP | 15,470 | 41.87% | 16,170 | 28.56% | 31,640 | 33.82% |

Authorship of PBVUSD compilation is unknown, but "NDC" may refer to National Demographics Corporation, "SWDB" to StatewideDatabase.org, "ACS" to American Community Survey of the U.S. Census